UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------X
JIMMY ZAPATA,

      Petitioner,      <u>MEMORANDUM & ORDER</u>
                  03-CV-5730 (NGG)

   - against -

GARY GREENE, Superintendent,
Meadow Correctional Facility,

      Respondent.
----------------------------------------------X
GARAUFIS, United States District Judge.

   Pro se petitioner Jimmy Zapata brings this application for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. Zapata challenges his 1998 conviction in Kings County, New

York for Murder in the Second Degree (N.Y. Penal Law § 125.25[1]). For the reasons set forth

below, the petition is denied.

**I. Background**

   *A. Prosecution and Conviction*

   The government's evidence at trial established that on May 24, 1997, at approximately

12:00 a.m., on Glenmore Avenue between Warwick and Jerome Streets in Brooklyn, New York,

Zapata and his friend Julio Cortez confronted Angel Cotto Hernandez and attempted to rob him

of a chain he was wearing. (Lieberman Aff. at ¶ 4.) During the attempt to rob Hernandez, a

struggle occurred in which Cortez fired his gun, hitting Hernandez in the chest. (<u>Id.</u>) Hernandez

died as a result of the gunshot. (<u>Id.</u>)

   Zapata and Cortez were charged with three counts of Murder in the Second Degree (N.Y.

Penal Law § 125.25(1), (2), (3)), two counts of Attempted Robbery in the First Degree (N.Y.

1

Penal Law §§ 110.00, 160.15(1), (2)), and one count each of Attempted Robbery in the Second

Degree (N.Y. Penal Law §§ 110.00, 160.10(1)) and Criminal Possession of a Weapon in the First

and Second Degrees (N.Y. Penal Law §§ 265.03, 265.02(4)).  (Id. at ¶ 5.)

    During a pre-trial hearing, both Zapata and Cortez moved for suppression of statements

they had made to law enforcement officers.  Following a hearing on the admissibility of the

statements, during which Detective Joseph Quinn offered the only testimony, the trial court

denied the defendants' motions and found that the statements had been voluntarily made and

were, therefore, admissible.  (Hearing Tr. at 106-107.)  In reaching its determination, the court

made factual findings concerning the defendants' interactions with the police and the events

giving rise to their statements.  The court found that Zapata and Cortez had voluntarily

accompanied Detective Quinn to the police precinct after they provided inconsistent stories

concerning their whereabouts during the evening.  (Id. at 88.)  Once they arrived at the precinct,

Zapata and Cortez were separated and placed in different rooms.  (Id.)  Each defendant then

provided the police with a written statement that was exculpatory.  (Id. at 88-89.)

    At around 9:15 a.m. Zapata agreed to provide a videotaped statement to an Assistant

District Attorney ("ADA").  Prior to answering questions, he was advised of his Miranda rights

by the ADA.  During the recitation of these rights, Zapata asked whether he was being

prosecuted.  The ADA responded, "Not at this time."  (Id. at 89.)  Zapata agreed to speak with

the ADA and "was alert and answered questions loudly and clearly."  (Id.)  Like his earlier

written statement, his videotaped statement was exculpatory, denying any involvement in the

shooting.  (Id.)  Cortez also provided an equally exculpatory video statement at the same time.

(Id. at 89-90.)  Following the videotaped statements, Zapata and Cortez were questioned

"intermittently." (Id. at 90.)

At 2:05 p.m. Zapata told Detective Quinn that he wanted to tell the truth. Detective Quinn then advised Zapata of his Miranda rights from a card, which Zapata initialed to acknowledge his receipt. (Id.) Zapata then admitted his involvement in the shooting, telling Detective Quinn that Cortez had seen the victim approaching wearing a gold chain and had attempted to grab the chain from him. (Id.) When the victim resisted, Cortez pulled out a gun that subsequently discharged during the struggle. (Id.) Zapata put his statement in writing and once again agreed to speak with an ADA. (Id.) At 5:35 p.m. Zapata made a second videotaped statement to an ADA in which he indicated that he was present during the robbery and described how the shooting had occurred. (Id. at 91.)

After a lengthy outline of New York state precedent concerning the voluntariness of statements to the police, the judge summarized her findings regarding these events. She concluded that

> [the] defendants were not in custody when they made [their initial] oral and written statements . . . Although the statements were made in response to the officer's questions and without having given them their constitutional rights, the statements were voluntary and the defendants were not in custody. The lack of any overbearing interrogation by the police is borne out by the fact that the statements were made less than four hours after being in the precinct and were exculpatory in nature.

(Id. at 104.) The judge also found that Zapata's 9:15 a.m. videotaped statement was voluntarily made. (Id. at 104-105.) The judge reached this conclusion because the defendants had been apprised of their Miranda rights and because the statements were "exculpatory in nature and clearly did not think the defendant was under arrest but neglected to leave the precinct at some point." (Id. at 105.) (omission in transcript).

3

When it came to Zapata's statement made at 2:05 p.m., the judge observed that it was "[m]ore problematic" than the other statements "after more than twelve hours in the precinct." (Id.) Nevertheless, the judge found that "considering the circumstances, all of the circumstances, the totality of the circumstances . . . that the defendants were not in a custodial status, their statements therefore were voluntarily made and not inadmissible . . ." (Id.) The circumstances on which the judge based her determination included that

> the defendants had been given their Miranda Warnings about 9:00 that morning by the A.D.A. which was received in evidence on the videotapes, the fact that the questioning was intermittent, there was no terms of release of examination as we saw in Anderson,[1] the fact that the defendants were provided with food, with drink, the fact that the constitutional warnings were provided to them both on tape at 9:00 in the morning and then again before they made their statements . . .

(Id.) Ultimately, the judge concluded that "a custodial setting did not arise until the defendant inculpated himself, at which time his arrest was supported by ample probable cause." (Id. at 107.)

Zapata and Cortez were tried separately. (Lieberman Aff. at ¶ 7.)[2] As set out in ADA Lieberman's Affidavit, during Zapata's jury trial:

> the People presented, among other things, the testimony of Norman Wilson that he had heard a gunshot, had then seen three men in close proximity to each other in the area in which the gunshot apparently had been fired, had seen one of the men drop to the ground, and had seen the other two men walk away together.

---

[1] In People v. Anderson, 42 N.Y.2d 35 (1977), the New York Court of Appeals suppressed a defendant's confession by examining the totality of the circumstances, including that he was subjected to more than 19 hours of continuous interrogation and not advised of his constitutional rights until 13 hours into his questioning.

[2] Cortez was convicted of felony murder, but the New York Supreme Court, Appellate Division, Second Department, reversed his conviction finding that Cortez had received ineffective assistance of counsel at trial. People v. Cortez, 296 A.D.2d 465 (2d Dep't 2002). After a second trial, Cortez was acquitted. (Lieberman Aff. at 4 n.1).

> Although he was unable to identify defendant as one of the two men leaving the vicinity of the shooting, Wilson gave testimony suggesting that, shortly after the shooting, those two men had entered 305 Jerome Street. The People also presented the testimony of the superintendent of 305 Jerome Street – Leroy McLean – that, a few minutes after hearing a gunshot, he saw defendant and another man inside the building, coming down the steps; McLean recognized defendant as someone whom he had seen once or twice before and as someone who had relatives living in the building. In addition, the People presented evidence that defendant made an oral statement to a detective during which defendant admitted his involvement in attempting to rob Hernandez, and evidence that defendant made written and videotaped statements that, in defendant's presence, Cortez had tried to rob Hernandez and Cortez's gun had fired during the course of the robbery attempt.

(Id.) Further, over defense counsel's objections, the government was permitted by the trial court to introduce Cortez's exculpatory statements to the police regarding his and Zapata's whereabouts on the night of the shooting in order to show that the police continued to question Zapata because of the inconsistencies between their accounts of the evening's events. (Id. at ¶ 8). Zapata was convicted of felony murder and sentenced on May 20, 1998 to a prison term of twenty-three years to life. (Id. at ¶¶ 9-10.)

>    B.    *Procedural History*

Zapata appealed his conviction to the Appellate Division of the New York State Supreme Court, Second Department. (Id. at ¶ 11.) The grounds for Zapata's appeal were as follows: (1) the trial court erred in refusing to suppress his oral and written statements as products of Miranda violations; (2) the trial court denied him due process by improperly instructing the jury as to how it should consider the voluntariness of his statements; and (3) his Confrontation Clause rights were violated by the introduction of his accomplice's post-arrest statements. (Id.)

On February 5, 2001, the Appellate Division affirmed Zapata's conviction. People v. Zapata, 280 A.D.2d 500, 720 N.Y.S.2d 370 (2d Dep't 2001). The Appellate Division held "[a]ll

of the statements made by the defendant before he was advised of and knowingly waived his Miranda rights were made in a non-custodial context. Thus, the statements were admissible." Id. (internal citations omitted). The Appellate Division found that Zapata's remaining contentions lacked merit. Id.

Zapata next sought leave to appeal to the New York Court of Appeals. In his leave application, he raised the same issues dealt with in his direct appeal. (See Lieberman Aff., Ex. C). On December 17, 2001, the Court of Appeals denied Zapata leave to appeal. People v. Zapata, 97 N.Y.2d 690, 738 N.Y.S.2d 306 (2001).

On July 5, 2002, Zapata, represented by counsel, filed a motion to vacate his judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10(1). (Lieberman Aff. at ¶ 14.) The grounds raised by Zapata were as follows: (1) the trial court erred in admitting Cortez's statements to the police; (2) Zapata's trial counsel and appellant counsel "erred by failing to properly brief, object and preserve the totality of the Bruton/Cruz issue for review"; and (3) the Appellate Division "erred in failing to address the Bruton/Cruz issue for review." (Id. (quoting Zapata's Motion at 10).) By decision dated September 13, 2002, the Supreme Court, Kings County, denied Zapata's motion. (Id. at ¶ 15.)

Zapata then applied to the Appellate Division for leave to appeal from the denial of his motion to vacate. On August 12, 2003, Zapata's application for leave to appeal was denied.

Finally, Zapata filed this timely petition for a writ of habeas corpus on November 6, 2003.

## II.     Standard of Review

A federal court may issue a writ of habeas corpus only if the petitioner's custody is in

"violation of the Constitution or law or treaties of the United States."  28 U.S.C. § 2254(a).  See, e.g., Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).  Thus, a prisoner seeking the writ must allege that his conviction or sentence in state court violates constitutional or other federal rights.

Under the exhaustion requirement of 28 U.S.C. § 2254(b)(1), a state prisoner petitioning for a federal writ of habeas corpus must generally have first presented his claim to the state's highest court.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000).  In New York, this means that a defendant, having first appealed to the Appellate Division of the Supreme Court, must then seek leave to the Court of Appeals to review his conviction pursuant to New York Criminal Procedure Law § 460.20 (McKinney 1994).  See id.  But if the petitioner no longer has "remedies available" in state court under 28 U.S.C. § 2254(b), the claim should be considered exhausted.  Bossett v. Walker, 41 F.3d 825, 828-29 (2d Cir. 1994) (collecting cases).

Habeas review is also circumscribed by procedural defaults.  In addressing a habeas petition, a federal court must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  Further, this "doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."  Id.  Even in a case where the state court addresses the merits of the petitioner's federal claim in an "*alternative* holding," a federal habeas review is not permitted if the state court "explicitly invokes a state procedural bar rule as a separate basis for decision."  Harris v. Reed, 489 U.S.

255, 264 n. 10 (1989) (emphasis in original).

Exceptions exist to the independent and adequate state ground bar if the petitioner can make a showing of cause for the default and resulting prejudice, see Wainwright v. Sykes, 433 U.S. 72, 87 (1977), or can "demonstrat[e] a constitutional violation that resulted in a fundamental miscarriage of justice, *i.e.*, that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 729 (2d Cir. 2002). "To be credible such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995).

If the petitioner complies with these preliminary requirements, a federal court may address the merits of the constitutional claim. Under 28 U.S.C. § 2254(d), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In clarifying these provisions, the Second Circuit has explained that an "adjudication on the merits" means one "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). The Supreme Court has explained that the "contrary to" standard means that a district court "should

ask whether the state court's application of clearly established federal law was objectively

unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000). The Court went on to elaborate

that "a federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

## III.    Discussion

In his petition, Zapata raises the same claims presented in his direct appeal before the

Appellate Division. These include Zapata's contentions that: (1) the trial court erred in refusing

to suppress his oral and written statements; (2) the trial court denied him due process by

improperly instructing the jury as to how it should consider the voluntariness of his statements;

and (3) his Confrontation Clause rights were violated by the introduction of his accomplice's

post-arrest statements. These claims are considered in turn.

### 1.    Suppression of Oral and Written Statements

Zapata contends that the statements he made to Detective Quinn and to the ADA should

have been suppressed as the products of unlawful interrogation. He argues that the state courts'

decisions to allow their introduction and then affirm his conviction were contrary to, or involved

an unreasonable application of, relevant Supreme Court precedent. (Pet. at 11.) In making this

claim, Zapata relies on a number of factual assertions regarding the events and circumstances of

his interrogation that are unsupported by the trial record. Because a federal habeas court may

only review issues of law and fact that have been properly presented to the state courts, Zapata's

factual claims are unexhausted. See Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) ("The

state courts will not have a fair opportunity to review the claim if material factual allegations

have been omitted.").  Based on the facts actually within the record, Zapata's claim that his

confessions were unlawfully obtained is unavailing.

### A.     Unexhausted Factual Allegations

A review of the record before the trial court reveals that many of Zapata's allegations

regarding the circumstances of his questioning are either contrary to facts in evidence or without

support in the record.  Because Zapata did not testify at the suppression hearing, his current

impressions or perceptions of the experience set forth in his petition have no basis within the

record.  Instead, the only evidence in the state court record comes from the testimony of

Detective Quinn during the suppression hearing, along with materials introduced as evidence

during his testimony, including Zapata's videotaped statements.

Among the factual allegations that Zapata appears to raise for the first time in his habeas

petition are the following: that he "protested that he did not want to go with the police" but that

"Detective Quinn then informed the Petitioner that they had no choice and to get into a police

car" (Pet. at 5); that upon arriving at the precinct, he was immediately locked inside an

interrogation room that was "semi dark" where Detective Quinn "commenced to apply

psychological pressure" on him (id. at 6 and 6 n.*); that he was taking medication to control

seizures at 11:40 p.m. every day and that "on several occasions, began crying, demanding his

seizure medication, and indicated that he wanted to go home and sleep" (id. at 7 n.*, 14); and

that his lack of medication was "[a]pparently . . . the major reason Petitioner broke down at 2:00

p.m."  (Id. at 7 n.*).

Based on the testimony and evidence actually presented during the suppression hearing, a

remarkably more benign picture of Zapata's trip to the precinct and subsequent questioning

emerges. The record first indicates that contrary to Zapata's present accounting, he accompanied Detective Quinn to the precinct on a voluntary basis. Not only did Detective Quinn testify that Zapata and Cortez agreed to go to the precinct when asked, but Zapata himself indicated in his first videotaped statement that he had willingly gone to the precinct to answer questions because he had nothing to hide.

Similarly, there is no basis in the record for Zapata's claim that the reason he broke down and confessed was because he was "suffering from an inorganic brain disorder that causes seizures." (Pet. at 12.) The only indication present in the record regarding whether Zapata suffered from such a disorder occurred in his first videotaped statement, when he told the ADA, "I get seizures, you know, and I'm locked in a room, you know. Bringing us for questioning, I didn't know why it took us this long, you know." But when the ADA followed up Zapata's comments by asking how he felt at the moment, he only replied: "I'm tired. I just want to go home and sleep 'cause I didn't do no crime. I just got nothing to hide. I just want to go to sleep." Thus, when given the opportunity, Zapata failed to elaborate on his condition or to mention that he needed medication. Besides this passing reference in his statement, there is simply no other evidence in the record that Zapata suffered from seizures or that a physical ailment contributed to his confession. Indeed, during the suppression hearing, Detective Quinn testified that Zapata had not had a seizure during the period he was present at the precinct. Nor was Detective Quinn aware that Zapata ever suffered from epileptic fits or that he had gone without his medication.

If the circumstances that Zapata describes in his petition were actually supported by the record in this case, they might well alter this court's conclusions regarding the lawfulness of his

interrogation. But because these factual allegations have never been presented to a New York court, they remain unexhausted for the purposes of federal habeas review. Accordingly, to the extent that Zapata's motion to suppress his statements is founded on factual allegations not supported by the record, it is denied.

B.       *Established Facts Regarding Zapata's Confessions*

Putting aside Zapata's unsubstantiated factual allegations concerning his questioning, he may still present a claim that his statements to the police should have been suppressed based on the facts actually within the record. This issue was addressed by the Appellate Division and squarely rejected on the merits. Zapata now argues that the Appellate Division's conclusion is either contrary to, or an unreasonable application of, relevant federal law. His claim seems to be based on two contentions, each of which was also raised on appeal. These are that he was in custody and therefore entitled to <u>Miranda</u> warnings at the time he made his exculpatory statements and that his subsequent waivers of his <u>Miranda</u> rights before providing inculpatory statements were involuntary because the circumstances of his custody violated due process. These claims are considered in turn and found to be without merit.

i.       *Whether Zapata was in Custody at the Time of His Exculpatory*
         *Statements*

The trial court found at the end of the suppression hearing that Zapata was not in custody until the time of his arrest. The Appellate Division in its review, however, concluded that a custodial setting arose once Zapata was advised of his <u>Miranda</u> rights, which first occurred during his 9:15 a.m. videotaped statement. The Appellate Division held: "All of the statements made by the defendant before he was advised of and knowingly waived his Miranda rights were made in a non-custodial context." 280 A.D.2d at 501. Although it would have been desirable

12

had the Appellate Division set out its reasoning with greater specificity, despite the brevity of its

explanation, its meaning is clear: the Appellate Division determined that Zapata initially

answered questions in a non-custodial setting but once he was provided his Miranda rights, he

was in custody and he then knowingly waived those rights. This ruling by the Appellate

Division differed from the trial judge's determination that a custodial setting had not arisen

despite the fact that Zapata was present at the precinct for some 12 to 15 hours. Thus, the issue

for this court is whether the Appellate Division's determination that a custodial setting did not

arise until 9:15 a.m. was an unreasonable application of, or contrary to, federal law.[3] See 28

U.S.C. § 2254(d). A review of the record reveals that it was neither.

In determining whether a suspect is in custody for Miranda purposes, courts look to

whether "a reasonable person would 'have felt he or she was not at liberty to terminate the

interrogation and leave.'" Tankleff v. Senkowski, 135 F.3d 235, 243 (2d Cir. 1998) (quoting

Thompson v. Keohane, 516 U.S. 99, 112 (1995)). Among the factors considered in making such

a determination are the length of the interrogation, whether a suspect is or is not informed that he

is free to leave, the location and atmosphere of the questioning, and the language and tone used

by the police. Id. at 244 (collecting cases).

Here, the trial judge's findings were that Zapata willingly accompanied the police to the

precinct from the scene of the crime and had been present there for less than four hours when he

made his initial statement. (Hearing Tr. at 104.) The trial judge also determined that there was a

_____

[3] Much of Zapata's claim seems to be premised on the findings of the trial court alone.
But for the purposes of this court's habeas review, it is the Appellate Division, the highest court
in New York to reach the merits of Zapata's claims, that has the final word as to the state's
disposition of Zapata's case.

"lack of any overbearing interrogation by the police." (Id.)  The door to the room in which

Zapata was located remained unlocked throughout this period.  (Id. at 56.)  Further, the trial

judge specifically gave credence to the testimony of Detective Quinn, who was the only witness

to testify during the suppression hearing.  (Id. at 86.)  Absent clear and convincing evidence to

the contrary, these findings of fact are presumed to be correct for purposes of this court's review.

See 28 U.S.C. § 2254(e).

Although reasonable jurists could disagree about whether Zapata was or was not in

custody during this initial period of his questioning based on these facts, a federal court "cannot

grant relief under AEDPA by conducting [its] own independent inquiry into whether the state

court was correct as a de novo matter."  Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140,

2150 (2004).  Rather, under § 2254(d)(1), the court can only grant the writ if the result "was

contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States."  In that regard, a finding that Zapata was

not in custody is not unreasonable.

A reasonable person in Zapata's position who had voluntarily agreed to go to the police

station might well conclude that he was also free to leave when he wished.  Such a belief would

have been supported by the fact that the police had employed no threatening or overbearing

interrogation tactics in order to elicit information from Zapata.  By way of comparison, in

Tankleff, the Second Circuit found that a suspect was in custody when "[f]or the last two hours,

he had been subjected to increasingly hostile questioning . . . during which the detectives . . . had

said that his story was 'ridiculous' and 'absurd' and added that they simply 'could not accept'

his explanations," and where the detectives lied that the suspect's father had woken from his

coma and accused him of the attack. 135 F.3d at 244. Further, Zapata was not handcuffed or

physically restrained by the police in any way. (Trial Tr. at 184.) Although Zapata's presence at

the precinct for close to four hours by the time he made his first statement, and the fact that it

was by then the early morning, are certainly factors that suggest coercive pressure, they are

insufficient for this court to disturb the state court's determinations.[4]

Accordingly, the court denies Zapata's claim that he was in custody at the time of his

initial, exculpatory statements.

*ii.*      *Whether there was a Valid Waiver of <u>Miranda</u> Rights*

In addition to the prohibition of custodial interrogation prescribed by <u>Miranda</u>, an

incriminating statement or confession may also be attacked on due process grounds. A suspect

who has knowingly waived his <u>Miranda</u> rights may contend that the confession was coerced in

violation of the Due Process Clause. <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000)

(noting that the Court has "recognized two constitutional bases for the requirement that a

confession be voluntary to be admitted into evidence: the Fifth Amendment right against

self-incrimination and the Due Process Clause of the Fourteenth Amendment."). Here, Zapata's

petition can be read to contend that his waivers of his <u>Miranda</u> rights were involuntary because

of the conditions of his interrogation and his vulnerability caused by his personal characteristics.

Like Zapata's <u>Miranda</u> claim, his due process claim was rejected by the state courts on the

merits, meaning that Zapata can prevail only if the state courts' conclusions were contrary to, or

---

[4] Because the court concludes that Zapata was not in custody until his first videotaped
statement, it is unnecessary to address Zapata's arguments, based on <u>Rhode Island v. Innis</u>, 446
U.S. 291 (1990), that he was subjected to impermissible custodial interrogation during this
period without the benefit of <u>Miranda</u> warnings.

involved an unreasonable application of, federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the court proceeding.

Although the Appellate Division's rejection of Zapata's due process claim did not invoke the totality of the circumstances standard, or even provide much in the way of explanation for its decision, it did reject the claim on the merits. As a result, this court must evaluate whether that decision was an unreasonable application of clearly established Supreme Court precedent. See Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) ("Nothing in the phrase 'adjudicated on the merits' requires the state court to have explained its reasoning process.").

In evaluating whether a defendant's due process rights have been violated, the relevant inquiry is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). This "due process test takes into consideration 'the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation.'" Id. (quoting Schneckloth, 412 U.S. at 226). "There are various factors to be considered in making a determination of voluntariness--they include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." United States v. Okwumabua, 828 F.2d 950, 953 (2d Cir. 1987). "In connection with the third factor, whether a suspect has been advised of his rights under Miranda is an important consideration in determining whether a confession is voluntary." Vasquez v. Senkowski, 54 F.Supp.2d 208, 215 (S.D.N.Y. 1999) (citing Davis v. North Carolina, 384 U.S. 737, 740-41 (1966)).

After a close review of the record in Zapata's case, the court concludes that the Appellate Division's determination that Zapata "knowingly waived his Miranda rights" was based on a reasonable determination of the facts and comports with relevant federal law. First, and quite significantly, on the three occasions on which Zapata provided inculpatory statements he was first advised of his Miranda rights and waived them. There is nothing in the record to suggest that Zapata did not understand the nature of these rights when they were given to him or that his waiver of those rights was anything but knowing and voluntary. See Tankleff, 135 F.3d at 245; Bruno v. Cunningham, No. 03 Civ. 937, 2004 WL 2290503, at *9 (S.D.N.Y. Oct. 8, 2004). Indeed, having reviewed both of Zapata's videotaped statements, this court was able to observe his demeanor and behavior when he waived his Miranda rights. In each video Zapata appears alert and to understand the warnings being provided to him by the ADA. While the fact that Zapata voluntarily waived his Miranda rights is highly probative of the voluntariness of his confessions, it is not dispositive. As the Supreme Court observed in Dickerson:

> The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry. But as we said in Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433, n. 20, 104 S.Ct. 3138.

530 U.S. at 544. Therefore, the court must evaluate the other details of Zapata's interrogation to determine whether the Appellate Division's determination was reasonable.

The conditions under which Zapata was interrogated and the manner of the interrogation itself were not coercive. As discussed more fully above, Zapata agreed to accompany the police to the precinct. Thus, his interaction with the police was not initiated by events, such as a show of force or an arrest, that would tend to overwhelm a suspect or create a hostile relationship.

There is also nothing in the record to indicate that the tenor of Zapata's interrogation grew appreciably hostile over its course. Indeed, the trial judge concluded that the "inculpatory statements were not the result of overbearing interrogation." (Hearing Tr. at 106.) Significantly, there is no indication in the record that the police employed any sorts of threats or deceptive tactics in order to elicit a confession from Zapata. Thus, there is no support for Zapata's contention that Detective Quinn "knew all the tricks of breaking [his] . . . will to prompt a statement." (Pet. at 12.) There is also no indication that Zapata requested the presence of counsel at any time during his questioning. Nor was Zapata handcuffed at any time during his questioning or locked in the interview room where he was questioned. (Trial Tr. at 184.)

Additionally, the interrogation of Zapata was carried out "in an intermittent fashion" (id.) and thus, despite the lengthy period that Zapata was present at the precinct, it was less likely to elicit a confession through sheer exhaustion. See, e.g., Maldonado v. Greiner, No. 01 Civ. 0799, 2003 WL 22435713, at *33 (S.D.N.Y. Oct. 28, 2003) (Report and Recommendation by Magistrate Judge) (finding length of interrogation reasonable where even though the defendant was present in the precinct for about twelve hours, the total period of questioning was only about sixty to eighty minutes). For instance, Detective Quinn testified at trial that for four hours before the ADA arrived to take Zapata's first videotaped statement he did not question him at all. (Trial Tr. at 183.) Detective Quinn also testified that between Zapata's first videotaped statement at around 9:00 a.m. and when Zapata indicated a willingness to tell the truth at 2:00 p.m., that he had not questioned Zapata continuously and that he remained unrestrained. (Id. at 190.) Zapata was also provided with food and drink during the course of his questioning and allowed to use the telephone (Trial Tr. at 184), which the trial court reasonably concluded made the conditions

of his questioning less onerous.  See, e.g., Green v. Scully, 850 F.2d 894, 902 (2d Cir. 1988)

(citing as a relevant consideration in determining whether a confession is voluntary whether the

defendant underwent a prolonged period of physical deprivation of "food, water or sleep, or even

of clothing").

Finally, there is nothing in the record to indicate that Zapata's mental or physical

characteristics were such that he was particularly susceptible to police interrogation.  As

discussed above, Zapata's contention that his epileptic seizures caused his confession is without

basis.  There are no other facts in the record that would suggest that the state courts made an

unreasonable determination that Zapata's physical or mental characteristics allowed his will to

be overborne by the circumstances.  At the time of his questioning, Zapata was twenty-one years

of age: an adult by any standard.  And there is no indication that his "experience and

background" or "lack of education or intelligence" played any role in his decision to make a

confession.  Green v. Scully, 850 F.2d at 902.  While Zapata indicated in his initial statement to

Detective Quinn that he had drunk a forty-ounce beer earlier in the evening, Detective Quinn

indicated at trial that when he spoke to Zapata it did not appear that he was intoxicated.

Detective Quinn testified: "There was no odor of alcohol on him nor did he have alcohol with

him.  He was not incoherent or unsteady on his feet."  (Trial Tr. at 181.)

Although Zapata was present at the precinct for an extended period of about fifteen hours

before giving his second videotaped statement, and complained that he was tired and wanted to

go home during his first videotaped statement, it was not unreasonable for the state courts to

conclude that Zapata's confessions were still freely given.  While deprivation of sleep is

certainly a factor that a court may consider in determining the circumstances surrounding the

voluntariness of a confession, see Green v. Scully, 850 F.2d at 902, it is but one factor that must be viewed in combination with all the others. Here, it was not unreasonable for the state court to conclude that the other circumstances of Zapata's questioning directed a finding that his confessions were voluntarily made.

Accordingly, the conclusion of the state court that Zapata's waivers of his Miranda rights were voluntary under the totality of the circumstances, was neither "contrary to" nor an "unreasonable application of" Supreme Court precedent.

> 2.    *Jury Instructions as to the Voluntariness of Statements*

Next, Zapata contends that the trial court's erroneous instructions to the jury concerning the voluntariness of his statements deprived him of due process. Specifically, he argues that the trial court failed to properly instruct the jury on two key points. First, Zapata asserts that the judge should have instructed the jury that notwithstanding compliance with Miranda, a statement should not be considered if it was elicited following a custodial, pre-Miranda interrogation unless there was a pronounced break in the questioning. Second, he argues that the judge failed to explain to the jury the general principles of voluntariness.

Although these arguments were made by Zapata on direct appeal, they were framed solely as a matter of state law and, therefore, have not been properly exhausted for federal habeas purposes. In order for a federal habeas court to review a claim, a petitioner must have "'fairly presented' the federal constitutional nature of a claim to the state courts." Reid v. Senkowski, 961 F.2d 374, 376 (2d Cir. 1992) (quoting Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991)). For a petition to meet this requirement, it means that "in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature."

Daye v. Attorney Gen. of New York, 696 F.2d 186, 193 (2d Cir. 1982).  Notice to the state court of the federal nature of a claim can be accomplished in a variety of ways, including explicitly presenting constitutional arguments, relying on federal and state cases that employ a constitutional analysis, asserting claims so as to bring to mind a specific right protected by the Constitution, or alleging facts that fall within the mainstream of constitutional analysis.  Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 124 (2d Cir.1995).  Even if a petitioner only cites to specific provisions of the United States Constitution in "his state court brief, the petitioner has fairly presented his constitutional claim to the state court."  Davis v. Strack, 270 F.3d 111, 122 (2d Cir. 2001) (finding claim fairly presented where petitioner mentioned due process right to a fair trial and the Fourteenth Amendment in point heading in state appellate brief) (citations omitted).

Here, Zapata's brief to the Appellate Division failed to provide notice that he was challenging the judge's instructions to the jury on federal constitutional grounds.  Although the heading in Zapata's brief to the Appellate Division argued that the trial court's instructions "denied him due process of law," the brief contained no other elements signaling that Zapata was raising a federal constitutional issue.  See Petrucelli v. Coombe, 735 F.2d 684, 688 (2d Cir. 1984) ("a mere statement that 'due process' rights have been violated does not necessarily give rise to a specific federal constitutional claim.").  Instead, the brief specifically argued that Zapata's post-Miranda confessions should have been suppressed because of a standard established "under the State Constitution."  (Appellate Brief at 37, Pet. Ex. A.)  Similarly, the argument in Zapata's brief to the Appellate Division regarding a general voluntariness charge relies solely on a state procedural law and state court precedents in arguing that the trial court

erred.  (Id. at 40-41.)  Based on the arguments in his brief, rather than invoking a federal constitutional principle, Zapata seems to have been invoking due process under the state constitution, or he may have employed the phrase as a general term denoting unfairness.  See Petrucelli, 735 F.2d at 688 ("'Due process,' like 'fair trial,' can be a catchphrase used by habeas petitioners as part of an allegation about any type of trial court error, including errors in rulings based on state law.").

Because Zapata's brief makes no specific reference to the United States Constitution, the Appellate Division was not provided with notice that he was invoking federal law.  That being so, the situation at hand is distinguishable from cases in which district courts have found claims exhausted where there was even just a passing reference to a specific provision of the United States Constitution.  See, e.g., McRae v. Senkowski, No. 01 Civ. 2916, 2002 WL 1880730, at *7 (S.D.N.Y. Aug.15, 2002) ("While [petitioner] did not cite to any federal case law, he did make specific reference to 'due process' and to his right to a 'fair trial' and cited to the 14th Amendment . . . ."); Calderon v. Keane, No. 97 Civ. 2116, 2002 WL 1205745, at *12 (S.D.N.Y. Feb.21, 2002) (reference to "due process" and the Fourteenth Amendment satisfied exhaustion requirement); Santana v. Kuhlmann, No. 97 Civ. 3882, 2001 WL 1143182, at *7 (S.D.N.Y. Sept. 26, 2001) (exhaustion requirement satisfied by, inter alia, reference to Fourteenth Amendment in point heading); McCaskell v. Keane, No. 97 Civ. 2999, 2001 WL 840331, at *7-8 (S.D.N.Y. July 26, 2001) (claim of denial of "fair trial" and passing reference to Fourteenth Amendment held sufficient to raise claim of denial of federal due process).

Perhaps more significantly, Zapata's contentions also find no support in federal constitutional law.  As a result, the Court of Appeals would have reasonably concluded that

Zapata was appealing solely on state grounds. First, New York law is more favorable to defendants than federal law when it comes to the admissibility of a suspect's inculpatory statements when they are made both before and after <u>Miranda</u> warnings. Under <u>Oregon v. Elstad</u>, 470 U.S. 298, 318 (1985), "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite <u>Miranda</u> warnings." Under New York law, however, the admissibility of a post-<u>Miranda</u> statements is determined by whether there is a "definite, pronounced break between the statements which preceded <u>Miranda</u> warnings and the additional statements which the defendant made." <u>People v. Rifkin</u>, 289 A.D.2d 262, 263 (2d Dep't 2001). Thus, because Zapata's claim regarding the definite break between questioning is not actually cognizable as a federal claim, the Court of Appeals would, naturally, have been unlikely to view it as such.

Similarly, Zapata's contention that he was entitled to a general jury instruction concerning the voluntariness of his statement arises under New York law and is without support in federal law. Although in New York state courts a defendant is entitled to a voluntariness charge, <u>see</u> N.Y. C.P.L. 710.70(3); <u>People v. Cefaro</u>, 23 N.Y.2d 283 (1968), there is no analogous requirement under the United States Constitution. <u>See</u> <u>Lego v. Twomey</u>, 404 U.S. 477, 489-90 (1972) ("We also reject petitioner's final contention that, even though the trial judge ruled on his coercion claim, he was entitled to have the jury decide the claim anew."); <u>Lake v. Greiner</u>, No. 98 Civ 6289, 2003 WL 21508326, at * (E.D.N.Y. Jun. 16, 2003) (Weinstein, J.) ("Petitioner cites no Supreme Court case, nor is this court aware of any, that has held that a voluntariness charge is *per se* required even where defendant does not ask for it."); <u>Rodriguez v. Artuz</u>, No. 99 Civ 9752, 2002 WL 31093605, at *7 (S.D.N.Y. Sept. 18, 2002) ("Because

[petitioner's] claim that the jury was not properly instructed arises under New York law, not federal constitutional law, consideration of this claim on habeas is barred.").

Although Zapata raised a federal constitutional due process claim concerning the judge's jury instructions in his application for leave to appeal to the New York Court of Appeals, doing so did not serve to exhaust the claim for federal habeas purposes. An application for leave to appeal to the New York Court of Appeals is discretionary except in capital cases. See N.Y. CPL §§ 450.90(1), 460.20. "Presenting a claim for the first time to a state court of discretionary review is insufficient to exhaust the claim unless the court considers it." Lurie v. Wittner, 228 F.3d 113, 124 (2d Cir. 2000). Because the Court of Appeals denied review of Zapata's application without reaching the merits of his claims it did not consider this issue and it, therefore, remains unexhausted. As a result, this claim is technically unexhausted and would typically be dismissed by this court. But since Zapata finds himself in the position of having no "remedies available" in state court, the claim is deemed exhausted. Bossett, 41 F.3d at 828-29 (collecting cases). He has utilized the one appeal to the New York Court of Appeals to which he is entitled. N.Y. Court Rules § 500.10(a); see id. at 829. Additionally, under the restraints on collateral review prescribed by New York Criminal Procedure Law § 440.10(2)(c), Zapata is prevented from collaterally attacking his conviction on this ground. See Bossett, 41 F.3d at 829. Accordingly, the court deems Zapata's claim procedurally barred.

In any event, even if the purported federal constitutional nature of Zapata's claim was properly presented to the Appellate Division, and thus ripe for adjudication by this court, it is by now clear that the claim is without merit. As discussed above, under Supreme Court precedent, there is no federal requirement that a pronounced break occur before continued questioning of a

suspect following custodial, pre-<u>Miranda</u> interrogation.  Similarly, there is no constitutional requirement that voluntariness claims must be submitted to both a judge and jury; thus, there can be no requirement that a judge provide a voluntariness instruction to the jury after already having decided that a statement was made voluntarily.

Accordingly, Zapata's claim that he was deprived of due process when the trial judge failed to properly instruct the jury regarding the voluntariness of his statements is denied.

     *3.*      *Introduction of Accomplice's Post-arrest Statements*

Finally, Zapata challenges the introduction at his trial of exculpatory statements Cortez initially made to the police concerning his whereabouts on the night of the shooting.  The prosecution sought to introduce a videotape of Cortez's statement, which contradicted Zapata's initial accounting of their activities during the evening, in order to demonstrate why Detective Quinn was interested in continuing to question both Zapata and Cortez.  While Zapata had initially told the police that he had been to Coney Island with Cortez and their girlfriends, Cortez indicated that the group had just been hanging out in a neighborhood park.  The trial judge allowed the introduction of the tape over defense counsel's objection, directing the jurors that "[t]he weight that is given to the exhibit . . . is entirely up to you."  (Trial Tr. at 187.)  Zapata argues, as he did in his appeal, that the use of Cortez's statements violated his rights under the Sixth Amendment's Confrontation Clause, as set out in <u>Bruton v. United States</u>, 391 U.S. 123 (1968), and were used by the prosecutor as substantive evidence of his guilt.  (Pet. at 26-27.) The court disagrees.

In <u>Bruton</u>, the Supreme Court held "that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a

25

participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." Richardson v. Marsh, 481 U.S. 200, 201-02 (1987) (explaining Bruton). In light of this standard, it is clear that Zapata's claim must fail. Not only was Cortez's statement exculpatory of himself, more importantly, it was not facially incriminatory of Zapata in any way. As a result, Bruton is inapplicable. See, e.g., Hoffman v. Kuhlmann, Nos. 98-CV-3528, 03-MISC-0066, 2003 WL 22964466, at *12 (E.D.N.Y. Dec. 1, 2003) (Weinstein, J.) ("The statement was not facially incriminating of petitioner. It therefore does not fall within the Bruton rule.").

In any event, even if the introduction of Cortez's statements constituted a Sixth Amendment or Bruton error, it was plainly harmless in light of the strong evidence of Zapata's guilt. In a habeas proceeding, an error under Bruton is harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" Samuels v. Mann, 13 F.3d 522, 526 (2d Cir.1993) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotations omitted)). Zapata is therefore not entitled to habeas relief unless he can demonstrate that the alleged Bruton error resulted in "actual prejudice." Brecht, 507 U.S. at 637. In determining prejudice, the weight of the prosecution's evidence is the most important factor. See Samuels, 13 F.3d at 526-27.

The evidence of Zapata's guilt was strong. The prosecution was able to offer three confessions made by Zapata admitting his role in the shooting. The first confession consisted of Detective Quinn's notes regarding Zapata's oral accounting of the shooting given at 2:00 pm. (Trial Tr. at 201.) The second was Zapata's handwritten statement made immediately after his oral confession to Detective Quinn. (Id. at 203-204.) Finally, Zapata's videotaped confession

taken at 5:35 p.m. was admitted into evidence.  (Id. at 219-21.)  Any of these confessions

standing alone was likely sufficient to secure conviction, but in combination they provided

overwhelming evidence of Zapata's guilt.  In particular, the opportunity for the jury to see

Zapata confess to the crime in his own words on video would have left no room for doubt in the

minds of the jurors.  See, e.g., Graham v. Hoke, 946 F.2d 982, 995-96 (2d Cir. 1991) (finding

that a statement by a co-defendant that implicated the defendant did not "contribute" to the jury's

verdict, where three confessions by the defendant, including a videotaped statement, were

offered into evidence).  The prosecution's case was also supported by the testimony of two

witnesses who placed Zapata and Cortez in the vicinity of the shootings at the time they

occurred.  Norman Wilson testified that he witnessed the shooting, and although he could not

identify Zapata as one of the assailants, he did testify that he saw them enter 305 Jerome Street

shortly after the shooting.  (Trial Tr. at 132-34.)  Leroy McLean testified that he saw two men,

including Zapata, who he recognized because his relatives lived in the building, leaving 305

Jerome Street minutes after hearing what sounded like a gunshot.  (Id. at 152-57.)  Although

these witnesses did not testify that they saw either Zapata or Cortez actually commit the

shooting, their testimony further buttressed the prosecution's case by establishing that Zapata

and Cortez had the opportunity to commit the crime.

When the alleged harm of the admission of Cortez's statement is viewed against the

plentiful evidence of Zapata's guilt, it is clear that its introduction resulted in no actual prejudice.

Zapata argues that these statements were "exploited by the prosecutor . . . for no other logical

purpose than to disprove petitioner's version of the events."  (Pet. at 27.)  Zapata also argued on

appeal that the statements were harmful because they demonstrated his consciousness of guilt

and proved that he was working with Cortez. (Pet. Ex. A at 44.) Both of these contentions suffer from the same fundamental shortcoming: any possible damage done by introducing Cortez's statements was eclipsed by the introduction of Zapata's own confessions. Besides the fact that Zapata did not testify and therefore did not present his own version of events at trial, the story he initially told Detective Quinn about going to Coney Island was obviously discredited by his later confession concerning the actual events of the evening. Similarly, Zapata's consciousness of his own guilt was amply demonstrated in his written statement to the police: "We truly didn't mean to do this. We really regret doing this. We really feel bad by the guy's family and would like to apologize for our stupidity, or better yet, mistake." (Trial Tr. at 203-204.) At most, the introduction of Cortez's statement signaled to the jury that Zapata was dishonest in his initial dealings with the police, a fact that clearly pales in comparison to the admission in his own words of his involvement in the murder. Their introduction therefore amounted to harmless error.

Accordingly, Zapata's claim concerning the admission of Cortez's statement is denied.

**IV.    Conclusion**

For the reasons discussed above, Jimmy Zapata's petition for a writ of habeas corpus is DENIED. A certificate of appealability shall not issue. The Clerk of Court is directed to close the case.


SO ORDERED.

Date:   June 27, 2005                         /s/ Nicholas Garaufis_____
        Brooklyn, New York                    NICHOLAS G. GARAUFIS
                                              United States District Judge